First Division
June 5, 2006

No. 1-03-2563

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | 01 CR 18619 |
| | ) | |
| MANISH PATEL, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Eddie A. Stephens |
| | ) | Judge Presiding |

JUSTICE McBRIDE delivered the opinion of the court:

In March 2003, after a jury trial, defendant Manish Patel was found guilty of solicitation of murder for hire and was sentenced to 20 years in prison.

Defendant appeals, contending that (1) the trial court erred when it failed to give the jury written instructions until 40 minutes into deliberations; (2) the trial court improperly struck the majority of defense witness Mike Kill's testimony; (3) defendant was denied a fair trial because the prosecution made improper comments during closing argument and during the examination of witnesses; (4) the trial court erred in denying a defense request to instruct the jury on a lesser included offense; and (5) the trial court erred in admitting prior consistent statements of one of the state's witnesses.

The following evidence was presented at defendant's trial.

Jyoti Patel, defendant's wife, testified that she was born in India and came to the United States when she was 15. When she was approximately 20 years old, Mrs. Patel became a United States citizen and then returned to India with the purpose of getting married. It was at this time that she first met defendant. Mrs. Patel and defendant were engaged for about a month before they married in an arranged marriage. Arranged marriages are common in the Hindu faith, of which she

and defendant are both members. Divorce, however, is not allowed in the Hindu faith and is very difficult for women.

After they were married, Mrs. Patel and defendant came back to the United States to live, and defendant eventually got his United States citizenship. After he got his citizenship, Mrs. Patel said, defendant changed. He began telling Mrs. Patel that she did not clean or take care of their son, and he used to rip up her clothes. When they were first married, Mrs. Patel worked outside of the house. Shortly after their son was born, however, she stayed home with their son for approximately one year. When Mrs. Patel returned to work, she and defendant sent their son to India to be with defendant's mother. Mrs. Patel told defendant on several occasions that she did not like this arrangement. She suggested a divorce, but defendant stated "no I don't want to give you a divorce. Everything will be all right."

In July 2001, Mrs. Patel was working at a Citibank branch in Niles. She worked every day (except Tuesdays and Sundays) from 9 to 5. When she worked, she would go home for lunch any time between 12 and 2 p.m. Defendant knew her schedule.

Mrs. Patel testified that from 1993-95 she worked at 3-COM. She met a man there named Mukesh Thakore. The two became friends, and Mrs. Patel gave Thakore some personal information regarding her date of birth and social security number, which he used to apply for and obtain a credit card. Thakore ran up a large amount of charges that negatively affected defendant's credit rating. She told defendant that because he was not giving her any money and would rip up clothes she bought, she thought Thakore would help give her money. Thakore never gave Mrs. Patel any money. Mrs. Patel denied having an affair with Thakore.

Mrs. Patel stated that Friday, July 13, 2001, was her wedding anniversary. She and

2

defendant were going to have guests over to their house Saturday to celebrate. Mrs. Patel was home preparing to cook for the weekend when she received a phone call from a police officer, and then went to the police station.

In court, Mrs. Patel identified photos, which were later shown to be photos defendant gave to Robbie Jones, as showing her in the pictures and coming from her home.

In April 1999, Robbie Jones began working at Speed Scan, a Northfield company that scanned documents into computers. When Ms. Jones began working at Speed Scan, defendant was her supervisor and responsible for evaluating her job performance. The two did not socialize together.

In late May or early June 2001, Ms. Jones and defendant had a conversation in Ms. Jones' car about defendant's wife. Ms. Jones had gone to her car for a smoke and although defendant did not smoke and was not invited by Ms. Jones, he followed her to the car. During their conversation in her car, the defendant told Ms. Jones that he wanted her to find someone to kill his wife. She did not take defendant seriously and they both laughed. After the defendant got out of her car, Ms. Jones dialed 911. She asked, "what would happen if I knew someone that wanted to get his wife killed? What should I do?" The 911 operated responded, "Ma'am, that's a serious case. If you don't do anything, it's going to be your fault." The operator also told her to go to the police station, which she did not do. On another occasion, Ms. Jones told the defendant about a funeral she had attended with some relatives. Defendant remarked, "you people know how to kill people."

Ms. Jones testified that defendant "kept asking" her to find someone to kill his wife. In fact, Ms. Jones said "it would be like every other day" that defendant would ask her to find someone to kill his wife. On July 9, 2001, the defendant brought this up when a coworker named Chintan

3

Thakkar was nearby. While Ms. Jones "tried to blow it off," she eventually began to take defendant seriously because of how much he kept talking about it.

About two or three weeks after her initial conversation with defendant in her car, Ms. Jones spoke with a coworker, Samuel Hernandez, about defendant's request. Mr. Hernandez was defendant's assistant supervisor. When she told Mr. Hernandez about defendant's request, Mr. Hernandez replied that the defendant was probably just upset and that Ms. Jones should just "blow him off." Ms. Jones tried to "blow him off," but was unable to avoid the defendant completely.

At some point before July 9, 2001, defendant sent everyone except Ms. Jones and himself to lunch. While everyone was at lunch, he asked Ms. Jones what she was waiting for. He told her to hurry up and get it done, which she interpreted as finding someone to kill his wife. Ms. Jones responded that the people he wanted her to get to kill his wife were waiting for an answer. She thought that by telling defendant that she could get someone to kill his wife, he would leave her alone. She was afraid if she told him to "get lost" that she would have lost her job. Defendant asked "how much is it going to cost" him, but Ms. Jones did not give a figure. She told defendant that he "would have to pay them." Defendant said all he had was $500.

On July 8 or 9, defendant brought in some pictures of his wife and her work schedule. After defendant gave Ms. Jones these items, she went to defendant's supervisor, Patrick Schutt, and told Mr. Schutt that she had a problem and wanted to know what she should do about it. She did not disclose who it was she was talking about because she did not want to get defendant in trouble. Mr. Schutt later testified that he referred the matter to his supervisor, the company president, and then went on vacation.

On July 13, Ms. Jones went to the Northfield police department. She explained to the police

4

officers what happened and gave them the envelope that contained the schedule and pictures of defendant's wife. The police instructed Ms. Jones to return to work and told her that they would contact her. At approximately 2 to 3 that afternoon, Ms. Jones received a call on her cellular phone. When she answered, a voice asked her if defendant was there and she said yes. Ms. Jones was then asked if she could set up a meeting where defendant could meet an undercover officer. The meeting would take place at 6 p.m. in the Dominick's parking lot in Northfield, which was not even five minutes away from Speed Scan. Defendant agreed to the meeting.

Ms. Jones was told to go to Dominick's after she and defendant got off work. She and defendant drove to Dominick's in separate cars. Ms. Jones was given a description of the person to look for, but when she got to Dominick's, no one matched the description. Defendant joined Ms. Jones in her car and they waited. She asked defendant if he was sure he wanted to go ahead with it, and defendant responded, "once I make up my mind, I don't change it."

After waiting a while, defendant went into the store. While he was in the store, an undercover officer approached Ms. Jones. Ms. Jones and the officer had a discussion and she told the officer that she was nervous. The officer told Ms. Jones not to be nervous and that, when the defendant came out of the store, she was to go inside. When defendant came out of the store, Ms. Jones started walking toward the store. As they approached each other, Ms. Jones asked defendant if he was sure. Defendant indicated he was sure, and Ms. Jones said "there he go," and went inside the store.

Illinois State Police Officer Larry Lewis was assigned to the DuPage Auto Theft Task Force in July 2001. On July 13, 2001, he received a call that a black agent was needed for a solicitation of murder for hire case in Northfield. He agreed to serve as the undercover agent and signed a one-

5

party consensual overhear document that was faxed to him. The consensual overhear document indicated that he was agreeing to have his conversation recorded on tape (audio or video). The consensual overhear lasted for 30 days. At 3:39 pm on July 13, Judge Moran signed an order for use of an eavesdropping device that allowed the conversations between Officer Lewis and defendant to be taped.

Officer Lewis arrived at the Northfield police department around 5:30 to 5:45. Once there, he received instructions about where he was going, what was supposed to be done, and had a wire placed on him. Northfield Police agents, other Illinois State Police, and an assistant State's Attorney were present at the meeting. An Illinois State Police electronic technician fit him with a body wire, which is a transmitter and microphone that fits on the body.

Officer Lewis then went to the Dominick's parking lot where he was to meet defendant and a female, Ms. Jones. Once there, Officer Lewis got out of his vehicle, approached Ms. Jones, and identified himself. Ms. Jones was alone in her car and told Officer Lewis that defendant was inside Dominick's "buying something." Defendant eventually came out of Dominick's and started approaching Officer Lewis. As defendant approached, Officer Lewis told Ms. Jones to leave and go into the store. Officer Lewis observed Ms. Jones and defendant briefly speak with each other, and defendant continued toward Officer Lewis.

When they began speaking, Officer Lewis asked defendant "to tell me what he wanted me to do" and "do you want me to do the thing?" Officer Lewis also had the pictures of defendant's wife that Ms. Jones gave the police. Officer Lewis showed defendant the pictures and asked defendant if it was "the person he wanted me to do." Defendant responded that it was the person and that he did not want her to suffer. Officer Lewis testified that defendant said, "can you just finish it, finish it no

6

problem?"

Officer Lewis asked if defendant had the money. Defendant said that he talked to Ms. Jones about the money and that Officer Lewis would get his money. Defendant initially said he would give Officer Lewis $500, but then said he would give Officer Lewis an extra $25, for a total of $525.

Officer Lewis asked defendant why defendant wanted it done, and defendant said he and his wife were having problems with the marriage for six years. Officer Lewis then asked if defendant wanted it done the next day (Saturday.) Defendant did not want it done on Saturday because he and his wife were hosting a party. Officer Lewis asked about Sunday, which defendant said would be fine, but that his wife would be in church. Defendant also said that he did not want it to be an accident because he had a very safe car. Defendant wanted it to be a "straight up" job.

At this point in the trial, the prosecution played the video tape of Officer Lewis' meeting and conversation with defendant. There, defendant is observed meeting with Officer Lewis, and telling Officer Lewis to "do the thing." Officer Lewis is observed showing defendant some pictures and asking defendant if the pictures were of the "person you want me to do." Defendant responded, "that's right, yeah." Defendant is also observed telling Officer Lewis to "just finish anything," "finish without any problem." When the topic of money is brought up, defendant stated, "I don't have money right now," and "don't worry about money ... just trust me." When asked why he wanted it done, defendant responded that they have had a lot of problems for six years and that there is no way to work it out. The two men also appear to discuss a time frame for when it should be completed. Defendant is heard saying that he did not think "tomorrow" was possible because he and his wife were having guests that evening. When Officer Lewis asked, "anytime after tomorrow," defendant responded, "yeah, after tomorrow." Defendant also responded affirmatively when Officer

7

Lewis asked if defendant wanted "a straight up " job.

Officer Lewis acknowledged that defendant never asked Officer Lewis to actually "kill" defendant's wife and that $500 was not a lot of money. When working undercover on drug operations, the drugs are offered to the suspects at a fair market price so that the police are not accused of entrapping the suspects. Officer Lewis was not aware of a "fair market" price for killing one's spouse.

Defendant called Chintan Thakkar, a computer operator. Defendant was Mr. Thakkar's manager at Speed Scan. In June 2001, Mr. Thakkar had a conversation with defendant about personal issues. Before Mr. Thakkar discussed the substance of his conversation with defendant, the trial court instructed the jury that the testimony was only to be considered for the purpose of impeachment of a prior witness. Mr. Thakkar then testified that when he spoke to defendant about some personal problems Mr. Thakkar was having, Ms. Jones was at her desk, which was about 15 or 20 feet away. After Mr. Thakkar and defendant had their conversation, Ms. Jones got up from her desk and went to defendant's desk. With Mr. Thakkar and defendant present, Ms. Jones said, "I know the people who do the gang-banging." Mr. Thakkar testified that defendant never asked Ms. Jones to find someone to kill his wife. Defendant never asked Mr. Thakkar to find someone to kill defendant's wife either.

Mr. Thakkar never saw defendant follow Ms. Jones out to her car. Nor did Mr. Thakkar ever recall a time when defendant sent everyone except Ms. Jones to lunch. Mr. Thakkar testified that he and defendant were vegetarians and ate lunch together all the time. Mr. Thakkar said that there were locations at Speed Scan where people could have private conversations if they wanted. After July 13, 2001, Mr. Thakkar never saw defendant back at Speed Scan. Mr. Hernandez took defendant's

8

position as supervisor. Ms. Jones was next in line to get Mr. Hernandez' position.

At trial the parties stipulated that Illinois State Police Trooper Kaiton Bullock would testify that he was an expert in forensic computer evidence. Trooper Bullock examined the hard drive on defendant's computer and determined that defendant did not make the "schedule" he gave to Ms. Jones on that computer. An examination of the computer's Internet cache showed defendant had not done any Internet searches using the terms "kill" or "hit." The Internet cache is where Web pages and files are stored when they are viewed. Although it is possible to erase the Internet cache, Trooper Bullock did not believe this computer information was erased.

The defense also presented Investigator Mike Kill as a witness at trial. Kill held a variety of positions on the Chicago police department from September 1968 to October 1994, including working for the State's Attorney's office's organized crime unit from 1990-93. While with the State's Attorney's office, Kill investigated about 12 solicitation of murder for hire cases. Kill was retained by defense counsel to conduct an investigation in this case, and the interviewed Ms. Jones as part of his investigation. Ms. Jones said the defendant told her that he wanted to kill his wife for the insurance money. Ms. Jones also said, "[defendant] was going to leave me to take the heat. He didn't like me. He was just using me to get rid of his wife." Kill subsequently learned that Mrs. Patel did not have a life insurance policy.

Kill also determined that defendant owned his house and had about $45,000 in equity in the house. Kill said that the cost of the solicitation for murder in this case should have been about $40,000. He also said that in solicitation for murder cases, it is important that the suspect specifically define the act to be committed and pay money to the undercover officer. Kill stated that he was always told that he needed to get the subject to tender money. On cross-examination, Kill

9

testified that "the basic formula for the cost of human life for executioners is normally based on the assets that [the executioner] has available and the risk involved with getting a particular individual." When asked if he had ever had a solicitation for as little as $50, Kill replied that he has had them for as little as seventy-five cents. Further, if the person paying for the murder only had $500, then $500 would be the price if the risk was not extreme. Kill's testimony regarding the cost of a solicitation of murder for hire case and whether the investigation of defendant was proper were stricken by the trial court. The trial court stated that much of Kill's testimony constituted expert testimony and the defense had not designated Kill as an expert.

Following trial, the jury found defendant guilty of solicitation of murder for hire in March 2003. Defendant was sentenced to 20 years in prison.

Defendant first contends that the trial court erred when it failed to give the jury written instructions until the jury asked for them 40 minutes into deliberations.

Before the parties gave their closing arguments, the trial court advised the jury that the court would give them jury instructions on the law after the arguments. When the attorneys finished their closing arguments, the trial judge read the written instructions to the jury. The jury then began deliberating at approximately 3:52 p.m. At approximately 4:32 p.m., the jury sent out a note that read, "We need the papers for signing and information sheets re: the laws." At about 4:35 p.m., the trial court notified both parties (the State appeared in person and the trial court spoke to defense counsel on the phone). The parties agreed that the written instructions should go back to the jury and that it was an oversight that they had not previously gone back. At 4:50 p.m., the jury reached a verdict.

Defendant acknowledges that this issue was neither objected to at trial nor raised in his

10

written posttrial motion and ordinarily would be waived, but he contends that is should be considered under the plain error doctrine because this error effected the fundamental fairness of the trial.

Defendant cites to Supreme Court Rule 451 c  177 Ill. 2d R. 451 c   and Rule 615 a  134 Ill. 2d R. 615 a  . Rule 451 c  provides that  substantial defects  in jury instructions  are not waived  by  failure  to  make  timely  objections  thereto  if  the  interests  of  justice  require.    177 Ill. 2d R. 451 c . This exception to the waiver rule is limited to grave errors or situations where the case is close factually and fundamental fairness requires the jury to be properly instructed. People v. Markiewicz, 246 Ill. App. 3d 31, 43  1993 . Similarly, Supreme Court Rule 615 a  states  a ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. 134 Ill. 2d R. 615 a . Under the plain error doctrine, issues not properly preserved may be considered by a reviewing court under two limited circumstances  1  where the evidence is closely balanced, so as to preclude argument that an innocent person was wrongfully convicted  or  2  where the alleged error is so substantial that it affected the fundamental fairness of the proceeding and remedying the error is necessary to preserve the integrity of the judicial process.  People v. Hall, 194 Ill. 2d 305, 335  2000 . Defendant contends the alleged error affected the fundamental fairness of the trial. The State responds that this issue is waived and does not rise to the level of plain error because the jury was properly instructed on the law of the case. People v. Enoch, 122 Ill. 2d 176, 186  1988 .

Defendant relies upon People v. Cadwallader, 181 Ill. App. 3d 488  1989 , for his claim that the trial judge s failure to immediately give the jury written instructions requires reversal of a jury verdict. In Cadwallader, as the trial judge read the oral instructions to the jury, he realized an essential element of the offense was missing. The trial judge, however, continued to read the instructions the parties agreed upon, and

11

when he was finished, the jury began deliberations. Once the jury left the courtroom, the trial judge informed the parties that one of the instructions was missing a paragraph. Before the jury was called back and read the proper instructions, they had already deliberated for 35 minutes out of a total deliberation time of 72 minutes without the benefit of proper instructions. After the trial judge orally instructed the jury with the proper instructions, the jury was informed that they would be receiving a complete set of the written instructions. The jury retired to continue deliberating. When the bailiff went to deliver the corrected instructions, one of the jurors said, It doesn t make any difference, we have already reached our decision. Cadwallader, 181 Ill. App. 3d at 499-500. Based on these facts, the appellate court found that the jury was erroneously left to its own speculation and improvisation for the first half of deliberations, and that there was some indication on the record that the jury concluded the defendant was guilty before examining the written jury instructions. Cadwallader, 181 Ill. App. 3d at 503. As a result, the appellate court held that fundamental fairness and the interest of justice required defendant to receive a new trial.

In People v. Williams, the Illinois Supreme Court considered whether the failure to immediately give written jury instructions after the close of arguments was plain error. People v. Williams, 181 Ill. 2d 297 1998 . In Williams, the defendant argued that he was entitled to a new trial because the jury convicted him of first degree murder without the benefit of written instructions on second degree murder and self-defense. After closing arguments, the trial court read the prepared jury instructions to the jury, including the instructions on second degree murder and self-defense. The jury retired to deliberate at 5 15 p.m. Shortly thereafter, the parties realized that the written instruction on second degree murder contained an extra phrase. The trial court suggested several options, which included whiting out the extra phrase and sending the instructions back to the jury rereading the correct instructions or retyping the instruction to reflect the correct version. Defense counsel wanted the instruction retyped and sent back to the jury without rereading the instruction.

At 5 50 p.m., when the bailiff delivered all the written instructions to the jury, he was informed the

12

jury had reached a verdict. The jury, however, did not return to the courtroom. At 6:10 p.m., the court was informed the jury inadvertently signed an incorrect verdict form. The trial court recommended that it 1 have the jury submit all the verdicts, 2 poll the jury, and 3 question the foreman regarding the improperly signed verdict. All parties agreed with the trial court's recommendation.

At 6:25 p.m., the jury returned to the courtroom and the foreman gave the judge the voided verdict form and the correctly signed verdicts. The jury found defendant guilty of first degree "intentional" murder and first degree "felony" murder. The jury voided the "guilty of first degree "knowing" murder" verdict. *Williams*, 181 Ill. 2d at 316-17. Pursuant to an agreement by the parties, the trial court called the jury back and reinstructed the jury to render a verdict on first degree "knowing" murder. At 6:59 p.m., the jury found the defendant guilty of first degree "knowing" murder.

On appeal the defendant claimed that he was precluded from effectively presenting a lesser offense and his self-defense claim because the jury did not initially have the benefit of the written instructions. After reviewing the facts, the supreme court found there was no plain error because the instructional error was not so substantial to reflect on the fairness of the trial. The supreme court reasoned that the jury received proper oral instructions, the evidence against defendant was overwhelming, and despite indicating it reached a verdict before receiving the written instructions, the jury had the opportunity to further deliberate after receiving the written instructions. *Williams*, 181 Ill. 2d at 319.

We think the present case is analogous to, and even more compelling than, *Williams*. Similarly, we find no plain error here. Specifically, there was nothing wrong with these jury instructions. There is no dispute that when the judge read the instructions to the jury in open court, those instructions were proper. Further, the evidence against defendant was overwhelming. Finally, although the jury did not deliberate for an additional hour, as in *Williams*, after receiving the written instructions, it did have a chance to review the instructions before delivering a verdict.

13

In *Williams*, the supreme court distinguished the case before it from *Cadwalladder*, in which the jury did not receive proper oral instructions, the evidence was closely balanced, and there was some indication in the record on appeal that the jury had concluded defendant was guilty before it had examined the jury instructions. In *Williams*, however, the jury received proper oral instructions, the evidence against defendant was overwhelming, and despite indicating it reached a verdict before receiving the written instructions, the jury had the opportunity to further deliberate after receiving the written instructions. In light of *Williams*, we do not find *Cadwallader* persuasive. As mentioned above, the jury received the correct oral instructions, the evidence against defendant was overwhelming, and the jury had an opportunity to review the written instructions before delivering its verdict. Therefore, there is no plain error.

Defendant also argues that he had a constitutional and statutory right to appear and participate *in person and by counsel* at all proceedings that involve his substantive rights. *Emphasis in original.* Defendant relies on *People v. Childs*, 159 Ill. 2d 217 1994 , and *People v. McDonald*, 168 Ill. 2d 420 1995 , to support his argument. Both of these cases stand for the proposition that a defendant has a right to be present when the jury presents the trial court with a question regarding the law. That is not the case here. The jury note asked for the written instructions and the verdict forms. In fact, the trial court sent the instructions and verdict forms to the jury and did not write a response to the jury. Neither the jury note nor the discussion between counsel and the court had any effect on defendant s substantial rights. His presence at the discussion would not have changed the way the court responded. The jury received the proper oral instructions, and the court was just giving the jury the written instructions. Finally, defendant argues that the jury note indicated that the jury may have already reached their verdict at the time it sent the note out. It is only through speculation that defendant concludes the jury had already reached a verdict when it sent the note out. Speculation is insufficient to show actual prejudice to defendant. *People v. Gengler*, 251 Ill. App. 3d 213, 223 1993 . Therefore, any error in not immediately giving the jury the written instructions was not so substantial

14

that it denied defendant a fair trial.

We next address whether the trial court erred when it struck the majority of Kill's testimony.

Before the trial began, defense counsel listed Kill as a possible defense witness however, he was not designated as an expert witness. During direct examination, Kill testified about his experience as a police officer conducting solicitation of murder investigations. Kill further testified about the fair market value of a solicitation of murder for hire along with the proper procedures for conducting a solicitation of murder for hire investigation. In fact, Kill said that the cost for solicitation of murder for hire in this case should have been 40,000. This estimate was based upon a calculation of defendant s assets. Kill also testified that he used to train undercover officers working on solicitation of murder for hire cases, and that it was important for the undercover officer to elicit from the subject specifics about the act to be performed and the amount to be transacted for the particular act. The State repeatedly objected to Kill s testimony on the basis that he was improperly testifying as an expert witness.

At the conclusion of Kill s testimony, the State moved to strike all of Kill s testimony that was offered as Kill s opinion about how the investigation should have been handled, whether it was a proper investigation, and whether there was enough evidence to create a solicitation of murder for hire. The State argued that it would be forced to call the assistant State s Attorney who headed the organized crime group to testify that the investigation was proper, that the officer did everything he could, and that nothing went wrong. The State also argued that all of Kill s testimony was improperly allowed to come in under the guise of perfecting impeachment of Ms. Jones. Defense counsel replied that they did not proffer Kill as an expert and that his testimony was necessary to defendant s case. Defense counsel argued that Kill s testimony was relevant because Officer Lewis started out by trying to testify to what the market value of a solicitation for murder-for-hire should have been.

The trial court considered allowing the State to bring in a rebuttal witness, but stated t hese jurors

15

were told that this case would go to them today. Noting that a discovery violation had occurred, albeit inadvertently, the trial court ruled

> It is my opinion that Investigator Kill has testified, in effect, as an expert. The expert was not tendered for voir dire even though I am not saying that it was done intentionally by the defense here indeed, I think I previously said that it occurred inadvertently through the circumstances that presented themselves.
>
> And I am going to allow the questions regarding Robbie Jones. I am going to instruct the jury to disregard all of the other testimony. And we will proceed from there.

The jury was then instructed to disregard all of Kill's testimony that did not involve Ms. Jones.

On appeal, defendant argues that he was denied a fair trial because the trial court struck the majority of Kill's testimony. Defendant further argues that Kill did not testify as an expert, but as a lay opinion witness. Further, the discovery violation that occurred was not committed in bad faith and the trial court should have used less drastic sanctions. Defendant alternatively argues that he was deprived of effective assistance of counsel because his counsel failed to give notice that Kill would testify as an expert.

The State maintains that this issue has been waived for failure to properly preserve it and the claim does not rise to the level of plain error. Additionally, the State also argues that the majority of Kill's testimony was properly stricken because it was irrelevant to the issues in the case. Defendant never raised an entrapment defense, so any testimony regarding the "fair market value" for this crime, whether money changed hands, or whether the defendant used certain words was irrelevant, because the only value of the evidence would have been in an entrapment case if combined with an argument that the solicitation price was too low. The State also points out that the statute for

16

solicitation of murder for hire does not require the exchange of money or that specific words be said. Finally, the State argues that defendant has failed to overcome the strong presumption that counsel's representation was constitutionally adequate.

In this case defendant did not raise the issue of the stricken testimony in his posttrial motion. Generally, the failure to raise an issue in a written motion for a new trial results in waiver of that issue on appeal. *Enoch*, 122 Ill. 2d at 186. Therefore, the issue has been waived.

In his opening brief, defendant does not even argue the waiver issue or ask us to review this claim under the plain error doctrine. In fact defendant, for the first time in his reply brief, asks this court to consider the issue under the plain error doctrine. This request consists of a single sentence and states that even if the issue has been waived, this court should consider it because the evidence was closely balanced and the error deprived defendant his right to present a defense, therefore depriving him of a fair trial. Defendant s request is improper for several reasons. It is well settled that points not argued in appellant s opening brief are waived and shall not be raised in the reply brief. 134 Ill. 2d Rs. 341(e)(7), (g). Further, defendant s request is devoid of any analysis regarding how the evidence in this case is closely balanced. 134 Ill. 2d R. 341 e 7 defendant s brief should include a rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on People v. Nieves, 192 Ill. 2d 487, 503 2000 . Accordingly, defendant not only has waived the issue by failing to preserve it in the trial court, but has waived it on appeal for failure to comply with Supreme Court Rule 341.

Moreover, despite defendant s failure to preserve the issue, the plain error doctrine will not save this procedural default. As stated above, plain error is a limited and narrow exception to the general waiver rule, and is only invoked where the evidence is closely balanced or the alleged error is so substantial that it deprived the defendant of a fair trial. People v. Ceja, 204 Ill. 2d 332, 353 2003 . To begin, the evidence in this case was not closely balanced and overwhelmingly supported the jury s verdict.

17

The jury first heard from Mrs. Patel, who testified that she and defendant had been having trouble in their marriage for a number of years; however, divorce is not allowed in their religion. She also said that defendant treated her badly, including telling her she was not a good mother and tearing up her clothes. Ms. Patel suggested a divorce, but defendant replied, "no I don't want to give you a divorce. Everything will be all right." She also identified photos defendant gave to Ms. Jones.

Ms. Jones testified that in late May or early June 2001, she had a conversation with defendant in her car where he asked her to find someone to kill his wife. When defendant left Ms. Jones' car, she called 911 and asked what would happen if she knew someone who wanted to have his wife killed. The operator told her to go to the police station, which she did not do. On another occasion, when Ms. Jones told defendant about a funeral she attended with some relatives, defendant remarked, "you people know how to kill people."

Ms. Jones further testified that defendant kept asking her almost "every other day" to find someone to kill his wife. Eventually, she spoke with her supervisors at work about the trouble she was having with defendant. One of her supervisors suggested she try to "blow" defendant "off." Her supervisors appeared at trial and corroborated her testimony. Mr. Hernandez testified that Ms. Jones came to him in June 2001 to discuss a concern she had about defendant. Mr. Hernandez further testified that he told Ms. Jones that defendant was probably upset— just releasing steam —and she should "blow" defendant "off." He did not advise her to contact the police. Further, Mr. Schutt testified that in July 2001 Ms. Jones spoke to him regarding a complaint she had about another employee, but did not identify the employee. He referred the information on to his supervisor, the president of the company.

At some point before July 9, 2001, Ms. Jones found herself alone with defendant during lunch. Defendant asked Ms. Jones what she was waiting for and told her to hurry up and get it done, which she interpreted as finding someone to kill his wife. On another occasion, defendant asked Ms. Jones, "how much is it going to cost me?" When Ms. Jones told defendant he would have to "pay them," defendant said all he

18

had was $500. On July 8 or 9, defendant gave Ms. Jones pictures of his wife as well as his wife s work schedule.

On July 13, Ms. Jones went to the Northfield police station to discuss the matter with the police. The police instructed Ms. Jones to return to work and that they would contact her. As a result of Ms. Jones going to the police station, the Northfield police arranged a meeting between defendant and Officer Lewis. Officer Lewis testified that when he met with defendant he showed defendant pictures and asked if the person pictured was the person you want me to do. Defendant said it was and just finish anything, yeah. Ms. Jones testified the pictures were the ones defendant previously gave her. In addition to Officer Lewis testimony, the meeting between the two was videotaped. The jurors watched the videotape and was able to determine defendant s intent for themselves.

The defendant s case consisted of two witnesses presented for the purpose of impeaching part of Ms. Jones testimony. Mr. Thakkar testified that he did not hear defendant ask Ms. Jones to find someone to kill defendant s wife. However, this testimony was limited to a single occasion when the three were together. Kill was also used to impeach Ms. Jones testimony that defendant was going to get insurance money after his wife was killed. Kill testified that Mrs. Patel did not have any life insurance. Having reviewed the entire record, we conclude the evidence was not closely balanced, and therefore, we cannot reach the issue under the first prong of the plain error doctrine.

The second prong of the plain error exception can be invoked only where the error is so serious that its consideration is necessary to preserve the integrity and reputation of the judicial process. *Ceja,* 204 Ill. 2d at 354-55. In this vein, defendant argues that the trial court's decision to strike Kill's testimony severely prejudiced his ability to present a defense and to undercut the State's theory of the case. Defendant also claims that Kill possessed "knowledge beyond the ken of the common juror." We conclude his testimony regarding solicitation of murder for hire was an improper comment on the

19

question of law, was based on speculation, and was properly stricken by the trial court. Further, we conclude that its allegedly erroneous exclusion was not so substantial that it deprived defendant of a fair trial.

Generally, expert testimony is admissible when the expert testifies to matters that are beyond the common knowledge of ordinary citizens, and where such testimony will aid the fact finder in reaching its conclusion. *People v. Enis*, 139 Ill. 2d 264, 288 (1990). Unless a subject is difficult to understand, expert testimony may not be admitted on matters of common knowledge. *People v. Denson*, 250 Ill. App. 3d 269, 281 (1993). Additionally, statutory interpretation is not a matter to which an expert witness may testify. *Department of Corrections v. Illinois Civil Service Comm'n*, 187 Ill. App. 3d 304, 308 (1989). "Where the language of a statute is unambiguous and conveys a clear and definite meaning, a court has no right to look for or impose another meaning." *Department of Corrections*, 187 Ill. App. 3d at 308-09. It is the province of the trial court to instruct the jury on the law of the case. *People v. Boyd*, 88 Ill. App. 3d 825, 858 (1980). In the present case, Kill's testimony that no money changed hands and that defendant did not use specific words when he met with Officer Lewis was an attempt to instruct the jury on the law of the case.

In *Department of Corrections*, an expert witness testified that a regulation prohibiting state employees from accepting gifts, bribes or gratuities should be interpreted as also prohibiting the acceptance of anything of value, including a loan. The appellate court found that the testimony interpreting the clear and unambiguous language of the regulation must be rejected as a matter of law as impermissible testimony and as an erroneous interpretation of the regulation, not in accordance with the plain meaning of its terms. *Department of Corrections*, 187 Ill. App. 3d at 309.

Similarly, we find Kill's testimony was impermissible and an erroneous interpretation of the statute. Under Illinois law, "[a] person commits solicitation of murder for hire when, with the intent that the

20

offense of first degree murder be committed, he procures another to commit that offense pursuant to any contract, agreement, understanding, command or request for money or anything of value." 720 ILCS 5/8-1.2(a) (West 2000). The language of the statute is clear and unambiguous. Kill suggested that defendant was not guilty because no money changed hands and because defendant never used the word "kill" when he met with Officer Lewis. In essence, Kill's testimony attempted to instruct the jury that the law required an exchange of money and the use of specific words. However, the terms of the statute do not require that money change hands or that the solicitor actually use "specific words" in order to be found guilty of solicitation of murder for hire. Rather, "any contract, agreement, understanding, command or request for money or anything of value" is what is required for one to be found guilty. 720 ILCS 5/8-1.2(a) (West 2000). In the present case, there was an understanding that Officer Lewis was to kill defendant's wife in exchange for $525. The trial court properly struck this portion of Kill's testimony because it was the trial court's province to instruct the jury on the law. *Boyd*, 88 Ill. App. 3d at 858.

Furthermore, Kill's testimony was speculative and properly excluded on that ground. Regardless of how skilled or experienced an expert is, the expert may not offer a judgment or opinion based on conjecture. *People v. Ceja*, 204 Ill. 2d 332, 355 (2003). Expert testimony can only be introduced upon a proper foundation of facts already in evidence. *People v. Moore*, 199 Ill. App. 3d 747, 772 (1990). The proponent of the expert's testimony bears the burden of laying an adequate foundation establishing the information upon which the expert bases his opinion is reliable. *Hiscott v. Peters*, 324 Ill. App. 3d 114, 122-23 (2001). In the present case, Kill stated the "fair market value" would have been $40,000. However, he never really explained how he arrived at this figure. At one point, Kill said that he determined that defendant had approximately $45,000 in equity in his

21

house. Yet, at another point, Kill said the price of a solicitation of murder for hire case is based on the socioeconomic status of the hitman, plus the risk involved with the target. Kill never explained why the equity one has in his house is tied to "fair market value." However, even if defendant's home equity was tied into the "fair market value," Kill never explained how he determined the equity defendant had in his home. In addition, Kill had investigated solicitation of murder for hire cases where the agreed upon amount was as little as seventy-five cents. Kill never explained why someone who earns more money would pay more for this crime. Further, Kill's testimony was not consistent with respect to a "fair market value." Kill's testimony was based upon speculation and never rose to the level of that which would be admissible by an expert.

Further, the trial court could have stricken Kill's testimony as being a violation of discovery. Parties are under a continuing duty to disclose discoverable information, and if the information is discovered during trial, the court shall be notified. 134 Ill. 2d R. 415(c). A trial court may impose appropriate sanctions (e.g., exclude evidence) if it finds out that a party has failed to comply with an applicable discovery rule. 134 Ill. 2d R. 415(g); People v. Tinoco, 185 Ill. App. 3d 816 (1989) (upholding exclusion of character witnesses the defendant disclosed at the close of the State's case). The determination of an appropriate sanction is within the discretion of the trial court and will not be disturbed unless the sanction is prejudicial to defendant. People v. Johnson, 262 Ill. App. 3d 781, 788 (1994).

Here defense counsel acknowledged that he did not intend on presenting Kill as an expert until Officer Lewis testified regarding a "fair market value" for a solicitation of murder for hire case. Notwithstanding that defense counsel is the one that elicited the "fair market value" testimony from Officer Lewis, defense counsel knew before Kill was called as a witness that Kill would testify as an expert. However, despite this knowledge, defense counsel never informed the State or the trial court that he intended to elicit expert testimony from Kill. The State moved to strike Kill's testimony, and after considering argument from both sides the trial court struck

22

the portion of Kill's testimony that was not presented for purposes of perfecting impeachment of Ms. Jones.

Defendant further asserts that he was offering Kill as a lay opinion witness and not as an expert witness. Defendant relies on *People v. Jones*, 241 Ill. App. 3d 228, 233 1993 , to support his argument. In *Jones*, the defendant was charged with criminal sexual assault. The prosecution called the investigating detective as a witness at trial. The detective testified that he had been a police officer for 16 years and for the last $2\frac{1}{2}$ years was an investigator in the juvenile division, where he handled cases where juveniles were victims. He also testified, that based on his years of experience as a juvenile officer and his years with the detective division, it was normal when an officer first interviewed an alleged juvenile sexual abuse victim, for the alleged victim to deny any sexual contact. The *Jones* court noted that a lay witness may only testify in the form of an opinion if the testimony was helpful to a clear understanding of the witness testimony or the determination of a fact in issue. *Jones*, 241 Ill. App. 3d at 232. The court then ruled that the detective properly testified as an opinion witness because it was helpful to an understanding of the witness testimony and that of the victim . *Jones*, 241 Ill. App. 3d at 233.

We are not persuaded by defendant s reliance on *Jones*, because Kill s excluded testimony neither provided a clearer understanding of his own testimony, nor was it helpful in determining a fact in issue. First, as discussed above, much of Kill s testimony was contradictory e.g., regarding how he arrived at the fair market value . At one point he said the fair market value was based on the solicitor s financial situation, and later he said it was based on the executioner s financial situation. Further, Kill s testimony was not helpful to the determination of a fact in issue. Whether defendant failed to use certain words or failed to tender money to Officer Lewis was irrelevant to the jury s determination of whether defendant solicited Officer Lewis to kill his wife. Further, unlike the witness in *Jones* who testified about the victim s response to questioning, Kill was testifying about the statutory requirements for the offense of solicitation of murder for hire. Furthermore, *Jones* suggests that one may testify as a lay opinion witness if that person testifies based on his her own

23

perceptions. In the present case, Kill s testimony regarding the fair market value of this case goes beyond testifying on mere perceptions and adds a calculation to arrive at his figure. By adding the layer of a calculation to his precepts, Kill s testimony moved beyond that of a lay opinion witness and became that of an expert. See Jones, 241 Ill. App. 3d at 233. As discussed in detail above, Kill s excluded testimony was improper for several reasons, and therefore, the trial court did not err in excluding Kill s testimony.

Next, we address whether the trial court erred in denying a defense request to instruct the jury on a lesser included offense.

Defendant argues that the trial court erred by not instructing the jury on the lesser included offense of solicitation of aggravated battery. Defendant acknowledges that this issue was not raised in his posttrial motion, but he again urges this court to review it as plain error. Defendant claims that the evidence is closely balanced and that the error deprived him of a fair trial.

The State responds that defendant failed to raise this issue in his posttrial motion and is, therefore, waived. Further, even if the issue is not waived, the State contends that the defense did not present any evidence during the trial that would support a finding of solicitation of aggravated battery. Because defendant did not properly preserve this issue for review, it has been waived. Enoch, 122 Ill. 2d at 186.

Defendant argues that we should review this issue for plain error. Defendant has also waived the issue of plain error for his failure to comply with Illinois Supreme Court Rule 341(e)(7). 188 Ill. 2d R. 341(e)(7). Supreme Court Rule 341(e)(7) requires plaintiff's brief to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." 188 Ill. 2d 341 e 7 . Defendant s plain error argument consists of a single sentence asking this court to employ the plain error rule because the evidence in this case was closely balanced and the failure to include a lesser included offense instruction denied defendant of a fair trial. The

24

balance of his argument consists of explaining why the failure to provide a lesser included instruction was an error, not specifically a plain error. Defendant does not provide any analysis regarding how the evidence was closely balanced in this case or why the alleged error was so severe that is must be remedied to preserve the integrity of the judicial process. Accordingly, we find the argument waived.

However, assuming that this issue was not waived for failure to comply with Supreme Court Rule 341 e 7 , the issue fails on its merits. As previously stated, plain error review is limited to two circumstances 1 where the evidence is closely balanced, so as to preclude argument that an innocent person was wrongfully convicted or 2 where the alleged error is so substantial that it affected the fundamental fairness of the proceeding, and remedying the error is necessary to preserve the integrity of the judicial process. People v. Hall, 194 Ill. 2d 305, 335 2000 . As discussed above, the evidence in this case is not closely balanced. Therefore, we need only consider whether the alleged error was of such magnitude that defendant was denied a fair trial and remedying the error is necessary to preserve the integrity of the judicial process. Ceja, 204 Ill. 2d at 357. We find that the alleged error is not of such a magnitude that it denied defendant a fair trial.

Generally a defendant cannot be convicted of an offense that has not been alleged. People v. Baldwin, 199 Ill. 2d 1, 6 2002 . The Illinois Supreme Court has recognized a two-tiered exception to this general rule. First, a defendant can be convicted of an uncharged offense when the uncharged offense is identified by the charging instrument as a lesser offense of the charged offense. Baldwin, 199 Ill. 2d at 6. Whether a charged offense encompasses an included offense is a question of law that we review de novo. People v. Landwer, 166 Ill. 2d 475, 486 1995 . In the present case, defendant was charged with solicitation of murder for hire. In Landwer, the Illinois Supreme Court held that solicitation of aggravated battery was a lesser included offense of solicitation of murder for hire, and therefore, defendant would have satisfied the first tier analysis of the exception.

25

However, as noted, our analysis of whether the trial court erred in failing to instruct the jury on the lesser included offense does not end with the determination that solicitation of aggravated battery is a lesser included offense to solicitation of murder for hire. Rather, the entitlement to the lesser included offense instruction extends only if the evidence would rationally permit a jury to acquit the defendant of the greater offense and to determine that the defendant was guilty of the lesser offense. *People v. Parsons*, 284 Ill. App. 3d 1049, 1059 (1996). In fact, the Illinois Supreme Court has stated

Once a lesser included offense is identified, the question remains whether the jury should be instructed on the lesser offense. The identification of a lesser included offense does not automatically give rise to a correlative right to have the jury instructed on the lesser offense. Citation . Rather, an independent prerequisite must be met for the giving of a lesser included offense instruction citation , regardless of the approach used in identifying the lesser included offense.

A defendant is entitled to a lesser included offense instruction only if the evidence would permit a jury rationally to find the defendant guilty of the lesser included offense and acquit him or her of the greater offense. *People v. Novak*, 163 Ill. 2d 93, 107-08 (1994).

Even though defendant may argue that the evidence presented at trial could support a guilty verdict for the lesser included offense of solicitation of aggravated battery, a jury could not rationally acquit the defendant of the greater charge of solicitation of murder for hire so as to confine the guilty verdict solely to the lesser included offense. See *Parson*, 284 Ill. App. 3d at 1060. As previously discussed above, the evidence in this case is not closely balanced. Defendant s wife testified that their marriage had not been good. Ms. Jones testified that defendant repeatedly asked her to find someone to kill his wife. Defendant even went so far as to

26

give Ms. Jones pictures of his wife along with her work schedule, and said he could only afford to pay 500. Ms. Jones eventually went to the police with a schedule and photographs she received from defendant. As a result, a meeting was set up so that defendant could meet Officer Lewis. This meeting was videotaped. When they met, Officer Lewis showed the photos to defendant when the two met. Defendant was observed on the videotape as saying the person in the pictures was the person he wanted Officer Lewis to do. Defendant also instructed Officer Lewis to just finish anything, yeah. When Officer Lewis asked defendant if he wanted pictures after it was done, defendant declined, indicating that he would get news of it when it was done. When asked if he wanted it to look like an accident, defendant replied, Oh, no accident, and affirmatively indicated that he wanted it to be a straight up job. There is no rational basis upon which the jury could have separated the evidence that defendant never actually said the words kill or murder in the videotape from the evidence that defendant repeatedly asked Ms. Jones to find someone to kill his wife. See Parson, 284 Ill. App. 3d at 1060.

Defendant contends, however, that testimony of Mr. Thakkar laid the foundation for an instruction on the lesser offense. Specifically, defendant points to his conversation with Mr. Thakkar wherein they said if that happens back in India, we can beat that guy, and we can kick him out of – out of anywhere. We are unpersuaded by defendant's contention. This comment does not support a claim for an instruction on a lesser included offense. In this case, defendant was charged with attempting to hire someone to kill his wife. In order for the trial court to issue an instruction for solicitation to commit aggravated battery, defendant must present evidence that he was looking to have his wife battered. The above statement cannot be interpreted as being directed toward Mrs. Patel. The statement, we can beat that *guy*, and we can kick *him* out of – out of anywhere, is absolutely not directed towards Mrs. Patel, much less any female. Emphasis added. Consequently, no rational basis existed for acquitting defendant of the greater offense and convicting him only of the lesser included offense. Parson, 284 Ill. App. 3d at 1060. Therefore, we find the trial court did

not err in refusing to give an instruction on the lesser offense.

Moreover, even if there was an entitlement to an instruction on the lesser included offense of solicitation of aggravated battery, the evidence regarding the greater offense was so strong that any failure to instruct on the lesser offense would not have been prejudicial. *Parsons*, 284 Ill. App. 3d at 1060 see *People v. McClellan*, 232 Ill. App. 3d 990 1992 in a case involving armed robbery and the defendant s denied request for an instruction on theft, the court affirmed the trial court and held even if an instruction on a lesser offense might have been given, the failure to given an otherwise appropriate jury instruction requires reversal only if the defendant was so prejudiced by the failure as to affect the outcome of the verdict *People v. Fonville*, 158 Ill. App. 3d 676, 687-88 1987 affirmed trial court s denial of possession, a lesser included offense of possession with intent to manufacture and deliver controlled substance, where much of the evidence recovered from defendant s residence was also used in manufacturing heroin before distribution.

Defendant contends that indictment in this case is nearly identical to the indictment in *Landwer*, which provided the foundation for a charge of solicitation to commit aggravated battery. It is important to note, however, that the *Landwer* court never decided whether the failure to give a lesser included offense instruction rose to the level of plain error. Unlike this case, the defendant in *Landwer* properly preserved the issue for appeal. Therefore, the court did not have to consider plain error.

The decision of the circuit court of Cook County is affirmed.

Affirmed.

GORDON and BURKE, JJ., concur.

28