2020 IL App (2d) 190077-U
No. 2-19-0077
Order filed August 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Ogle County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-218 |
| DARYN A. JACOBS, | ) ) | Honorable John B. Roe IV, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Birkett and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   In defendant's appeal of his convictions for sex crimes against the child victim, C.W., we hold (1) the trial court properly admitted the victim's out-of-court allegations of sexual abuse; (2) the court properly found, after trial, that C.W. was competent to testify; (3) the court did not err in excluding the defense's proffered expert testimony that defendant was not a risk to himself or others and that C.W. exhibited attention-seeking behavior; (4) defendant forfeited his argument that the court erred in denying defendant's motion for a mistrial based on a question by the prosecutor that defendant claims implied wrongdoing on his part; (5) defendant forfeited his challenge to the exclusion of testimony; (6) the State did not commit prosecutorial misconduct in closing argument; and (7) the evidence was sufficient to support the convictions.

¶ 2    Defendant, Daryn A. Jacobs, appeals from his convictions of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)), and aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2016)). He raises multiple claims of trial error and asserts that the evidence was insufficient to support his convictions. We reject some of those claims and hold others to be forfeited. We therefore affirm.

¶ 3                              I. BACKGROUND

¶ 4    A grand jury indicted defendant on two counts of predatory criminal sexual assault of a child and one count of aggravated criminal sexual abuse. Each count alleged an act committed by defendant between May 23, 2016, and June 30, 2016, against a child under the age of 13. Count I alleged that defendant placed his finger in C.W.'s vagina. Count II alleged that he touched C.W.'s vagina with his hand for his sexual gratification. Count III alleged that he put his penis in C.W.'s hand for his sexual gratification. The charges stemmed from C.W.'s disclosures to family members and to a forensic interviewer: she reported that defendant, the husband of her babysitter, had pulled her into the bathroom of the couple's trailer, touched her inside her "pee pee," and made her touch his "pee pee." The babysitter, who had been taking a nap in the living room, walked in to the bathroom while C.W. and defendant were there. C.W. reported telling the babysitter about defendant's touching her.

¶ 5    The State moved under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2016)) to admit C.W.'s out-of-court statements, including comments that C.W. made to her mother and video recordings of two forensic interviews of C.W. In his response to the motion, defendant asserted that C.W. was not competent to testify; however, he did not file a motion pursuant to 115-14(c) of the Code (725 ILCS 5/115-14(c) (West 2016))

requesting that the court determine her competency.[1]  The court admitted most of the statements over defendant's objection.

¶ 6                    A. Motion *in Limine* - Dr. Thomas R. Campion

¶ 7    Defendant disclosed that he would seek to call Dr. Thomas R. Campion, a clinical psychologist, and the State moved to bar that testimony.  The parties agreed to deem Campion's testimony at the motion hearing to be defendant's offer of proof of the trial testimony.

¶ 8    At the motion hearing, Campion testified that he was licensed as a clinical psychologist in Illinois, but was not licensed under the Sex Offender Management Board Act (20 ILCS 4026/1 *et seq*. (West 2016)).  A focus of his practice was the psychological screening of police officers and firefighters for antisocial behaviors and impulsive tendencies.  (Defendant was a firefighter and emergency medical technician (EMT).)

¶ 9    Campion's evaluation of defendant included the administration of psychological tests such as the Minnesota Multiphasic Personality Inventory II, a clinical interview, and a review of records.  He also had defendant answer a life-history questionnaire.  The focus of his evaluation was assessing whether defendant posed "any potential risk to himself and others."  If called at trial, Campion would testify "to the conclusion of [his] reports," which was that no "significant emotion concerns" were indicated for defendant, nor did he "show a potential risk for maladaptive behavior."  In short, "there [was] not a thing that would suggest [defendant was] a risk" to himself or others.  Campion was asked whether, "[i]f a person had in fact already committed *** a sex

---

[1] Defendant asserted at oral argument that he had filed such a motion.  However, we do not find such a motion in the record and defendant has not provided a citation to the record showing where such a motion can be found.

offense," Campion would expect the results to be different than what he derived in evaluating defendant. Campion responded that he questioned the defendant about "pre-behaviors" and defendant "said there were [none] or he didn't have that information."

¶ 10    Campion also reviewed records, including the recordings of the two forensic interviews of C.W. He was prepared to testify at trial that he noted that C.W. displayed "hyperactivity, impulsive nature, [and that] *** she responded to questions in [an almost] appreciative *** way." Further, based on the records' suggestion that C.W. had had multiple informal babysitters, Campion concluded that she lacked consistent attention from a parent. In his opinion, children raised in such circumstances have "very little structure, they have no guidance[;] it makes them impulsive, reactionary, attention seeking[;] [they] typically bond quickly to relationships that may be unhealthy." Defendant asked what the "significance [was] of the child not showing any fear, embarrassment or negative responses or emotions while being forensically interviewed concerning [the] alleged offenses." Campion responded that children typically respond with shame but that C.W. enjoyed the attention. He opined that C.W. was displaying attention-seeking behavior.

¶ 11    On cross-examination, Campion conceded that very little of his work was with young children. Further, he did not do assessments of persons accused of sexual offenses; he rarely was involved in criminal cases. He displayed a lack of familiarity with victim-sensitive interviews such as the forensic interviews of C.W. Overall, his workload was about 20% therapy and 80% evaluations; he rarely evaluated children.

¶ 12    The court barred Campion's testimony, ruling that (1) Campion lacked the "scientific, technical or other specialized knowledge that will assist the trier of fact to understand the evidence or determine a fact in issue"; (2) Campion's evaluation of defendant was not relevant to the case;

and (3) Campion's "knowledge, experience, and expertise of the subject matter *** at trial [did] not go beyond the average juror's."

¶ 13                                B. The Evidence at Trial

¶ 14    Testimony at defendant's jury trial established that defendant was the husband of C.W.'s babysitter, Michelle Jacobs (Michelle).  C.W. was born on January 11, 2011.  Michelle began babysitting C.W. in 2014.   At that time, the Jacobses lived in an apartment in Shannon that they shared with a third adult, Claudia.   Defendant's son Connor, who was 10 in 2016, spent every other weekend with the Jacobses.   The Jacobses' apartment was a few blocks away from C.W.'s home, and C.W. came to the apartment every day, before and after preschool.   C.W. also spent some nights with the Jacobses.   The apartment was close to a park with a playground, and Michelle sometimes took C.W. there.   At the start of December 2014, the Jacobses and, seemingly, Claudia, moved to a trailer in Forreston, and C.W.'s stays became much less frequent.

¶ 15    The testimony also established that C.W.'s mother, Corrine Wallace (Corrine), was engaged to James Wallace (James); the two married in May 2016.   James was disabled and required Corrine's assistance with some medical needs.  (James, who had adopted C.W., died before the trial.)   Corrine started a cleaning business so that she could adapt her work hours to James's needs.   Corrine's father, Paul Rhoads (Paul), who went to church with Michelle, suggested Michelle as a babysitter.   Corrine did not pay Michelle to babysit C.W., but did bring food and sometimes did cleaning for the Jacobses.

¶ 16    Michelle testified that while the Jacobses lived in Shannon, Michelle usually took C.W. to the park twice a week.   Defendant never went with them or went alone with C.W.   C.W. needed assistance in the bathroom until about November 2014.   Defendant never helped her in the bathroom; either Michelle or Claudia did.   Michelle denied telling a police officer that the only

reason that defendant would ever take C.W. to the bathroom was when she needed to use a restroom in the park. Michelle testified that the park's restrooms were generally locked.

¶ 17    Defendant did not spend much time at home when C.W. was present. He worked as an EMT and spent some part of his on-call time at the fire station. Further, he was working on a criminal justice degree and had an old car that he worked on in a shed away from their home.

¶ 18    In the week before her wedding, Corrine was busy, so she had C.W. spend several nights with the Jacobses in their trailer in Forreston. The Jacobses attended the wedding and the reception on May 28, 2016. C.W. also attended. She mostly stayed with Corrine's mother, Lupe Rhoads (Lupe), and a family friend, Rebecca McCombs, during the reception.

¶ 19    McCombs testified that C.W. seemed to be acting oddly around Michelle at the reception. C.W. pulled McCombs aside and said that defendant and Michelle "were bad people, and [she] just [didn't] want to be around him." McCombs asked what the problem was; C.W. said, "[W]ell, I don't like him, he touched me." When McCombs asked her for more information, C.W. said that defendant had touched her "everywhere." C.W. told McCombs not to tell Corrine about this.

¶ 20    McCombs mentioned the conversation to Lupe and then to Corrine, who seemed distracted, McCombs called Corrine the next day and suggested that Corrine give C.W. dolls so that she could show what defendant had done to her.

¶ 21    Corrine followed McCombs's suggestion: as Corrine was putting C.W. to bed on the night of May 30, she brought out a doll and asked C.W. where defendant had touched her. C.W. said, "[W]ell, he tickled me and I didn't like it." Corrine accepted the answer and put C.W. to bed.

¶ 22    According to Corrine, C.W. went to stay with the Jacobses again on June 29, 2016. Corrine cleaned the trailer while the Jacobses watched C.W. When defendant started tickling C.W. on his lap, Corrine told him that C.W. did not like it, but defendant did not stop. C.W.

stayed over on that visit until the evening of June 30. On June 30, Corrine picked C.W. up at T-ball practice and, on July 1, took her to stay with Lupe.

¶ 23 According to Michelle, C.W. did not arrive at the Jacobses until the morning of June 30. Michelle did not account for that morning, but she did say that she did not think that she took a nap in the living room. From noon to 4 p.m., the Jacobses, C.W., and Connor were with a realtor looking at a house. Defendant inspected the house while Michelle stayed outside with the children. Michelle next took C.W. from Forreston to Lanark—about 20 miles—for T-ball, which started at 5 or 5:30 p.m. Defendant did not go into the bathroom with C.W., and C.W. did not tell Michelle that defendant touched her.

¶ 24 C.W. spent the night of July 1 with Lupe. Lupe, a certified nursing assistant (CNA), typically cared for C.W. on alternate weekends to the extent her employment permitted. On weekends that C.W. was not with Lupe, C.W. was usually with Lupe's ex-husband Paul and his wife, Pat Rhoads (Pat).

¶ 25 That night, Lupe noticed that C.W. was scratching her genital area. Lupe asked C.W. whether something was wrong. C.W. did not answer. Later, as she was getting ready for bed, C.W. told Lupe that defendant had "touched her" and pointed toward her crotch. Lupe examined C.W's genital area and noticed redness and irritation. On July 2, Lupe reported C.W.'s disclosure to James, whom she reached when trying to speak to Corrine.

¶ 26 C.W. was with Paul and Pat on July 2 through July 4. Corrine picked C.W. up on July 4 and drove her directly to a hospital in Dixon. Corrine questioned C.W. on the way: "I said, honey, I've been told that [defendant] touched you and I said to her, you know, this is serious and the doctors at the hospital are going to know if somebody touched you." C.W. said, "[T]hey're

making me keep secrets." C.W. stopped talking for a while after that. However, C.W. spoke to her again once they reached the hospital:

> "I said to her, [C.W.], you know, they're going to know if somebody touched you here at this hospital, you need to tell me the truth, and I was crying when I told her this and she said Mom; he washed his hands and he took me in the bathroom and he put his hands down my pants and touched me and he made me touch him, and that was it."

¶ 27 Corrine agreed that, when C.W. spoke to a doctor that day, her exact words were, "I'm here because I was abused." Corrine explained that this was probably language that C.W. learned in school.

¶ 28 Michael Boomgarden, the Forreston chief of police, spoke to Corrine while she was with C.W. at the hospital; she was "frantic." Boomgarden briefly spoke to C.W., but noted that she was "very bright, alert and wanting to help." Boomgarden arranged for C.W. to be interviewed at Shining Star Children's Center.

¶ 29 Corrine and C.W. spoke that evening. C.W. seemed to be afraid to have to talk to a policeman again. Corrine reassured her that she would go to a "special place for kids," and that the person she talked to might "use dolls or something like that." When Corrinne mentioned dolls, C.W. brought out three "Monster High" dolls, identified one as herself, one as defendant, and one as Michelle. Leaving the Michelle doll lying off to the side, C.W. had one doll (Michelle did not say which) touch the second doll's private area and then the second doll touch the first doll's private area. At that point, the Michelle doll "comes in and says, what's going on in here." This was C.W.'s "demonstration as to what had happened to her." C.W. then had the Michelle doll repeatedly and violently strike one of the other dolls. C.W. identified the doll being struck as her.

Corrine was "already sick enough" and did not ask C.W. any further questions that evening about what happened.

¶ 30                                    1. The Video of the First Forensic Interview

¶ 31    Traci Mueller, a forensic interviewer at Shining Star, interviewed C.W. on July 6, 2016. Almost immediately after Mueller walked C.W. into the interview room, C.W. told Mueller that she wanted to use dolls to show what had happened to her: "I have Barbies [in the car] to show you what happened to me."   Mueller told C.W. that they would not be using dolls and emphasized to C.W. that it was important to tell the truth during the interview and to avoid make-believe.

¶ 32    C.W. knew that she was there to talk about the person who had "touched [her] pee-pee." She called that person "Daryn," but he "ma[de her] call him dad."   He had touched her only once: in the bathroom at defendant and Michelle's house.   Defendant dragged her from the living room into the bathroom by her hand.   He held her hands down and "did it." It "felt bad."   He also "did something else" to her, but she could not remember what it was.   He washed his hands before and after touching her.   He then forced her to touch his "pee-pee."   Mueller asked C.W. what defendant's pee-pee looked like, and C.W. said it "had a little thing inside."   C.W. also said it was soft.

¶ 33    After defendant touched her, Michelle, who had been napping in the living room, opened the door and came into the bathroom.   Michelle asked what was going on, and C.W. said, " 'Daryn touched my pee-pee.' "   Defendant said that C.W. was lying, but Michelle decided that C.W. was telling the truth.   Mueller asked C.W. what happened after that, and C.W. said that she did not remember, but that her dolls would remember "because it happened to them last night."   She "showed [her] mom what happened to them last night."

¶ 34    When Mueller asked again what Michelle had done, C.W. said that Michelle had decided who was telling the truth by seeing who would be the first to raise a hand.

¶ 35    C.W. described the clothing defendant was wearing during the assault: he had a "firefighter shirt" that had a "little circle on it" and a ladder.  He wore jeans shorts over underwear that "looked like firefighter underwear.  They had firefighters on them."  She later added that the firefighters had hats on, and that defendant was wearing a "firefighter hat," which also had firefighters on it.

¶ 36    All of this happened the last time that C.W. was with the Jacobses; she affirmed that it had only happened once.  She also said that sometimes she slept with Michelle and defendant, but that nothing had ever happened when she did.

¶ 37    Near the end of the interview, Mueller said that she was going to leave the room briefly and told C.W. that she could draw if she wanted to.  C.W. said, "I'm going to start drawing about what happened."  She drew what she said was the bathroom with herself, Michelle, and defendant inside.  Defendant was making her touch his pee-pee with her hand.  When Michelle came in, she did "eenie, meenie, miney, moe," and C.W. won.  Michelle was "mad at [defendant], [and] happy at me."  Michelle touched defendant—C.W. acted out touching Mueller on the cheek lightly with one hand.  Asked to explain how defendant responded, C.W. touched herself lightly on the back of the head and said, "Then [defendant] did it to her."  C.W. said that she then "had to try it.  I tried it on the forehead."  Mueller told her that she was "being silly" and reminded her to only talk about things that had actually happened.  C.W. said that this had happened and was "called hit touching."

¶ 38 When Mueller told C.W. that it was important that she know that no one should ever ask her to keep a secret from her parents, C.W. responded, "Yeah, but I have a secret that no one can know, but if they want to know, they can know, and that's being a super hero [*sic*]."

¶ 39                    2. The Period Between the Two Interviews

¶ 40 Boomgarden observed the first interview through a video link. Corinne and Lupe had come with C.W., and he spoke to both of them. Corrine was still frantic to the extent that Boomgarden found it difficult to get information from her. Lupe, however, was helpful.

¶ 41 On the way back from the interview, Corrine asked C.W. if she wanted to talk about anything else. C.W. responded that defendant had made her "touch his butt," and that he had touched her while they were at the park in Shannon. When Corrine questioned her further, C.W. said that "it" had started when the Jacobses lived with Claudia in Shannon.

¶ 42 Corrine called Boomgarden as he was returning from Shining Star. As a result of the new disclosures, C.W. went to a second interview at Shining Star.

¶ 43                    3. The Second Forensic Interview

¶ 44 The second interview took place on July 26, 2016. On being shown into the interview room, C.W. immediately asked for what she called her "diary"—a little book of drawings that C.W. said that she had made after last having seen defendant, whom she described as "[t]he person who hurt me." Mueller and C.W. spent most of the interview talking about the drawings. C.W. identified some as depicting interactions between herself and defendant, but others were simply things that she just wanted to draw. C.W. said that several of the pictures were things that did not really happen. For instance, one represented defendant touching her head and her falling down. C.W.'s description of another was, "I'm floating in a chair in this picture." C.W. gave fanciful descriptions of several drawings but said that they had actually happened. In one drawing, she

was throwing "a billion balls" at defendant. In another, defendant was going to touch her, but Michelle snagged his shirt with a hook baited with candy. When Mueller reminded C.W. to talk only about real things, C.W. said that she "didn't know who was doing that, but [she could] remember the hook."

¶ 45 One drawing showed her and defendant going to the park in Shannon. C.W. explained that defendant "made [her] touch him at the park in the bathroom at the park." Defendant made her sit on the toilet and spread her legs. He put his hand in her clothes and touched her inside her "pee-pee," which "didn't feel good." He also put her hand in his clothes and made her touch him "there." She and defendant had been alone at the park; Michelle had stayed in the apartment.

¶ 46 Mueller tried to get C.W. to focus on the incident in the Shannon park, but C.W. kept shifting between drawings. In one drawing, C.W. was sitting on the sidewalk "[a]t [her] house," and defendant was about to touch her. C.W. explained that defendant and Michelle "would babysit [her] sometimes when [she was] at [her] house when [her] mom and Jim [were] away." One drawing, she said, showed her making cookies. C.W. then commented that defendant had pulled her into the bathroom, but this was not the incident that she first described. Further, one time when defendant and Michelle were babysitting her at her house, defendant pulled her into the bedroom, touched her "in the butt," and said, "I don't like you."

¶ 47 Just after Mueller said that she had no more questions but asked C.W. if she had anything more to talk about, C.W. said that the only important thing was that defendant touched her while she was sleeping. She was in Michelle and defendant's bedroom:

"When he touched me when I was sleeping, and I went like, 'Daryn, what are you doing to me?'

And he's like, 'Nothing, nothing,' and then he went back to bed."

Defendant's hand was not touching her when she woke up. "Us kids" slept in one bed, and Michelle and defendant slept in another. When Mueller inquired further, she said that she slept in the same bed with Michelle and defendant. Asked to draw the bed, she depicted Connor in the bed as well. This incident occurred in a house with "a super, duper bathroom. Their bathroom was a bathroom that *** had a wooden toilet."

¶ 48    No one was able to locate C.W.'s "diary" after she brought it to the second interview.

¶ 49                                4. C.W.'s Trial Testimony

¶ 50    C.W., by then seven years old, testified that she lived in Shannon with her mother, who was named "Corinne," and that she went to Eastland Elementary School. She could not spell "school"—she spelled it "scool"—and she did not know what kind of work her mother did. Asked if she knew the "rules about being in court," she said that they were, "Always tell the truth," "Don't guess," "And it's okay if you don't know the answer." She did not know what would happen if she did not tell the truth.

¶ 51    C.W. identified defendant as someone who, with Michelle, used to babysit her in an apartment. With prompting, she said that she also remembered them babysitting her in a trailer. She could not remember what the trailer's interior looked like, but she remembered that it had two bedrooms, one bathroom, a kitchen, and a living room. She thought that she would "probably" recognize a photograph of the bathroom if she saw it. Asked if anything happened in that bathroom that she "did not like," she said that defendant "touched [her] private parts" and then made her touch his private parts. She was five years old when this happened. Her testimony about this incident was, in its general description of the assault, consistent with what she told Mueller at the first interview. On cross-examination, she had difficulty describing the precise sequence of events.

¶ 52    When the State asked C.W. whether "anything happen[ed] with [her] private parts *** that [she] didn't like" while defendant and Michelle were living in Shannon, C.W. said that defendant had touched her while they were in the apartment bathroom.   When the State asked C.W. about the park in Shannon, she said that she had gone into the bathroom in the park with defendant where he pulled her pants down and touched her "private."

¶ 53    On cross-examination, defense counsel asked C.W. if Michelle had played "eenie, meenie, miney mo" to decide who was telling the truth about defendant having touched her.   C.W. "guess[ed]" that it was true.   C.W. said that she had been telling the truth when she told Corrine that Michelle hit her.   She denied ever telling anyone that Michelle decided who was telling the truth by seeing who would raise his or her hand first.

¶ 54    Defense counsel questioned C.W. about how she knew what defendant's private looked like:

> "Q. You knew when [defendant] took his pants down, that was his private part, right?
>
> A. Yes.
>
> Q. And that's because you had seen a baby being changed, right?
>
> A. Yeah.
>
> Q. And [defendant's] was just like the baby so you figured it must be the private part, right?
>
> A. Yeah."

¶ 55    Defendant moved for a directed finding at the close of the State's case-in-chief, arguing, among other things, that C.W. "d[idn't] know the difference between truth and reality," and

therefore was not competent to testify. The court ruled that the evidence was sufficient to allow the case to go to the jury. It did not specifically rule on C.W.'s competency.

¶ 56                              5. The Court's Rulings During the Defense's Case

¶ 57    In this appeal, defendant raises two claims of error based on the court's rulings during the defense case. First, defendant contends that it was error for the court to exclude testimony by Melinda Jeanne Frisbie concerning an encounter with a woman who disparaged defendant and talked about wanting his money. Frisbie, in an offer of proof, testified that a woman (whom other evidence suggested was Corrine) had said that she was going to end up with all the Jacobses' money. The court disallowed this testimony on the basis that Frisbie could not identify Corrine. Second, defendant claims that he should have had a new trial because the State asked Michelle an improper question implying other wrongdoing on his part.

¶ 58    Michelle, as part of her testimony for the defense, authenticated a series of photographs showing, among other things, C.W. sleeping in a "toddler bed" in the Jacobses' home and C.W. interacting with defendant. The State asked her why she documented certain things so carefully:

"Q. [THE STATE] So why did you take a picture of her sleeping in her bed?

A. [MICHELLE] It wasn't necessarily [of] her, it was the bed itself. I keep a log of, of everything I do, even with my stepson, of places we go, times, and where and things that we do.

Q. And can you take pictures of all of it?

A. Most of them, wherever we go, I have receipts, dates, most of them.

Q. Why?

A. I always have."

¶ 59    Michelle said that she documented C.W.'s and Connor's stays, but not the stays of other children.   As she explained: "I only do it if they're there for a long period of time."   When the State started to ask another question, Michelle interjected, "To protect myself."   The following interchange ensued:

Q. [THE STATE] So, from the goodness of your heart you watch a child for a woman that you barely know, but you document everything?

A. [MICHELLE] I didn't start—

Q. You document everything to protect yourself?

A. Yes.

Q. Is that because you're married to the Defendant?

A. No.

Q. Are you worried about that?

MR. HELLER [(DEFENSE COUNSEL)]: Objection, Judge.

THE COURT: Sustained.   Jury should disregard that question.   Thank you.

¶ 60    Defendant requested a mistrial, citing, *United States v. Meeker*, 558 F.2d 387, 388 (7th Cir. 1977), which held that that "an attorney, and a prosecutor in particular, should not allude to matters that he has no reasonable basis to believe are relevant to the case or that will not be supported by admissible evidence."   The court ruled that *Meeker* was distinguishable because the prosecutor there asked four improper questions but here there was only one improper question.

¶ 61                C. Deliberations, the Verdict, and the Posttrial Motion

¶ 62    The jury found defendant guilty on count II (defendant touching C.W.'s vagina) and count III (placing C.W.'s hand on his penis) but not guilty on count I (placing his finger in C.W.'s

vagina). Defendant file a motion for a new trial briefly raising most of the issues raised in this appeal. One claim was a challenge to C.W.'s competency to testify.

¶ 63     The trial court denied the motion. The court held, *inter alia*, that C.W. was competent to testify, as she "answered [the court's] questions as best she could" and "answered the defense questions the best she could." The court added that C.W. was competent even at age five, as shown by the videos of the two Shining Star interviews from July 2016. During those interviews, she "answered the questions asked of her" and "talk[ed] about what's real and what's not real in the book that she had during the course of the [second] interview."

¶ 64     The court sentenced defendant to consecutive prison terms of 3 years and 12 years. Defendant did not file a postsentencing motion but filed a timely notice of appeal.

¶ 65                                   II. ANALYSIS

¶ 66     On appeal, defendant raises six claims of error:

     1. That the trial court erred in allowing C.W. to testify and in admitting her out-of-court statements when her memory at trial was incomplete and significant inconsistencies existed between her two Shining Star interviews.

     2. "That the verdict is against the manifest weight of the evidence."

     3. That the trial court erred in excluding the proposed opinion testimony of Campion, given that (according to defendant) "the evaluation *** of sex offenders is within the purview of his psychology license" and that his proposed opinion testimony did not go to the ultimate issue of defendant's guilt.

     4. That the trial court erred in excluding Frisbie's testimony about the conversation in the polling place given that it was clear that the person she overheard was Corrine.

5. That the trial court erred in denying defendant a new trial based on the State's question to Michelle about whether she kept records to protect herself from defendant.

6. Whether, as a matter of "plain error," defendant was entitled to a new trial due to prosecutorial misconduct in closing argument.

Defendant implies in his discussion of the standard of review that he will also be claiming a violation of the principles of *Brady v. Maryland*, 373 U.S. 83 (1963), a claim which he made in his posttrial motion. However, no such claim appears in his brief.

¶ 67 We note that not all of defendant's present claims were preserved for appeal. In criminal cases, "to preserve an issue for review, a defendant must raise it in *either* a motion *in limine* or an objection at trial, *and* in a posttrial motion." (Emphases in original.) *People v. Denson*, 2014 IL 116231, ¶ 18. However, the State has argued such procedural forfeiture only with respect to defendant's argument regarding prosecutorial misconduct in closing argument. We address that forfeiture claim below. *Infra* ¶ 104-06. With respect to defendant's remaining contentions on appeal, the State has itself forfeited any claim of forfeiture. See, *e.g.*, *People v. Bridgeforth*, 2017 IL App (1st) 143637, ¶ 46 ("The rules of waiver also apply to the State, and where, as here, the State fails to argue that defendant has forfeited the issue, it has waived the forfeiture.").

¶ 68 An argument, of course, can be preserved for appeal yet inadequately developed before us. Supreme Court Rule 341(h)(7) requires an appellant's brief to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). A reviewing court is entitled to briefs in which the appellant presents coherent arguments that clearly define the issues and which cite appropriate supporting authority. *E.g.*, *People v. Jacobs*, 405 Ill. App. 3d

210, 218 (2010). Points not supported by adequate argument are forfeited. See. *e.g.*, *People v. Patel*, 366 Ill. App. 3d 255, 274 (2006).

¶ 69 Only one of defendant's claims comes close to being fully developed. Conversely, only two claims are so poorly developed that we consider them forfeited: the claim that the court improperly excluded Frisbie's testimony and the claim that the trial court erred in denying defendant a new trial based on the State's question to Michelle about whether she kept records to protect herself from defendant. See *infra* ¶¶ 97-103. The remaining claims are developed to varying degrees, and we address them to the degree fairness permits.

¶ 70                    A. C.W.'s Competency to Testify/
                    Admissibility of Out-of-Court Statements

¶ 71 Defendant contends that the trial court erred both in admitting C.W.'s out-of-court statements and in allowing her to testify. He argues that, in deciding *both* questions, we must address "the same four criteria that the trial court considered *** at the [section]115-10 motion hearing." However, rather than list the criteria for admitting out-of-court statements under section 115-10, defendant lists four factors relating to the competency of a witness to testify. Defendant's conflation of the competency standard with the standard for admission of out-of-court statements under section 115-10 makes it difficult to address his argument in the form that he presents it.

¶ 72 First, although his argument appears to assume that the court made a preliminary ruling on C.W.'s competency, it did not. Defendant never asked the court to rule on C.W.'s competency until he raised the matter in his posttrial motion.

¶ 73 Second, the factors for admitting an out-of-court statement under section 115-10 have little in common with the criteria for determining a witness's competency. Thus, defendant's arguments, which rely on the inconsistencies between C.W.'s two interviews at Shining Star and on her limited memory at trial of some of the events of 2016, are largely misdirected.

¶ 74   Defendant relies on *People v. McMillan*, 231 Ill. App. 3d 1022 (1992), in proposing that

we address the issues of competency and section 115-10 admissibility together.   He suggests that,

under *McMillan*, the incompetency of a child witness limits the admissibility of his or her out-of-

court statements.

¶ 75   We conclude that *McMillan* is of little aid to defendant.   In *McMillan*, the reviewing court

concluded that the trial court properly used its finding of a child witness's incompetency to testify

to support its ruling that some of the child's out-of-court statements were inadmissible under

section 115-10.   *McMillan*, 231 Ill. App. 3d at 1032.   Here, though, as we explain, the record

does not support defendant's claim that C.W. was incompetent to testify at trial.   If we take

defendant's argument at face value, this conclusion would be sufficient to defeat his claim that

C.W.'s out-of-court statements were inadmissible under section 115-10.   However, we will read

his arguments more charitably.

¶ 76                              1. C.W.'s Competency to Testify

¶ 77   Defendant contends that, primarily because C.W.'s memory of the assault was limited and

inconsistent, she was incompetent to testify at trial.   We do not agree.   Under sections 115-14(a)

and (b) of the Code (725 ILCS 5/115-14(a), (b) (West 2018)), every person is presumed competent

to testify and will be disqualified as a witness only if he or she is: "(1) Incapable of expressing

himself or herself concerning the matter so as to be understood, either directly or through

interpretation by one who can understand him or her; or (2) Incapable of understanding the duty

of a witness to tell the truth."

¶ 78   Defendant, invoking a standard that predates section 115-14, argues that the applicable

standard is a four-factor test set out in cases such as *People v. Diaz*, 201 Ill. App. 3d 830, 835

(1990):

> "In determining whether a witness is competent to testify, a trial court is to consider four
>
> criteria:
>
>> 1) the ability of the witness to receive correct impressions from his senses;
>>
>> 2) the ability to recollect these impressions;
>>
>> 3) the ability to understand questions and express answers; and
>>
>> 4) the ability to appreciate the moral duty to tell the truth."

Although courts still use this standard, it is outdated. Section 115-14, which became effective in 1989, has been interpreted as "a legislative determination to discard the body of law that had developed regarding witness competency, particularly the more rigid of those former rules, such as always requiring competency hearings for prospective witnesses under 14 years of age." *People v. Trail*, 197 Ill. App. 3d 742, 748 (1990). That said, at least one reviewing court has held that the traditional competency factors "are synonymous with the statutory requirement that the witness be capable of expressing himself in a manner in which he can be understood and be capable of understanding the duty to tell the truth." *People v. Harris*, 389 Ill. App. 3d 107, 126 (2009). Both the statutory standard and the traditional standard appear in recent opinions; there is no authority to suggest that they conflict. We accept *Harris*'s holding that section 115-14 did not abrogate the traditional standard. Nevertheless, we use the modern formulation. It is clearer, and it is the legislature's current statement of its intent.

¶ 79    Under section 115-14(c), a party seeking to disqualify a witness as incompetent should move for a competency hearing prior to the witness's testimony. 725 ILCS 5/115-14(c) (West 2018). When no such hearing has occurred, the court may rule on a witness's competency after observing his or her demeanor and abilities during the trial. *People v. Jackson*, 2015 IL App (3d) 140300, ¶ 46. Here defendant neither asked for a competency determination in advance of C.W.'s

testimony[2] nor moved the court to consider her competency when her testimony concluded. However, when defendant raised the issue of C.W.'s competency in his motion for a new trial, the court addressed the issue and found C.W. competent.

¶ 80    Regardless of whether there has been a competency hearing, the party seeking to disqualify a witness has the burden to prove that witness's lack of competency. *Jackson*, 2015 IL App (3d) 140300, ¶ 46. We disturb a trial court's competency determination only where the court abused its discretion. *Jackson*, 2015 IL App (3d) 140300, ¶ 46. We give deference to the trial court because, unlike us, it has "the opportunity to observe the demeanor, appearance, and conduct of the witness." *People v. Cookson*, 335 Ill. App. 3d 786, 789 (2002).

¶ 81    Here, the trial court did not abuse its discretion in finding after trial that C.W. was competent. C.W. answered questions appropriately, was capable of disagreeing with her questioners, and knew how to admit that she did not know the answer to certain questions. C.W affirmed that she should always tell the truth in court. While she claimed that she did not know what would happen to her if she failed to tell the truth, this answer actually suggested that she was responding honestly and spontaneously and had not been heavily coached.

¶ 82    Defendant argues that the implausible and inconsistent statements C.W. gave at Shining Star showed her incomprehension of the duty to tell the truth. These considerations are not relevant to her competency to testify *at trial*. C.W. was five years old when the interviews took

---

[2] Defendant asserted at oral argument that he had filed a motion challenging C.W.'s competency in advance of her testimony. However, do not find such a motion in the record and defendant has not provided a citation to the record showing where such a motion can be found.

place but seven years old when she testified. The record is consistent with C.W. having matured greatly in the interim.

¶ 83    Defendant further asserts that the court should have deemed C.W. incompetent because she spelled "school" phonetically and because she did not know what her mother did for work. These points pertain more to C.W.'s youth than her competency, and Illinois reviewing courts have upheld findings that much younger (and younger-acting) children than C.W. were competent to testify. For instance, in *Jackson*, a third district panel upheld the trial court's ruling after a competency hearing that K.R.L., a four-year-old witness, was competent. *Jackson*, 2015 IL App (3d) 140300, ¶¶ 12, 47. K.R.L. demonstrated that he knew the difference between the truth and a lie by saying "that it would be a lie to say that the book the judge held up was blue because it was actually yellow"; he also "was able to state his age, the names of his sisters, and that he lived with his mother and sisters." *Jackson*, 2015 IL App (3d) 140300, ¶ 47. Moreover, "[a]lthough K.R.L. did not respond to all of the questions posed to him by counsel and some of his answers were nonverbal, [he] was able to make himself understood when he responded to the questions of counsel and the court." *Jackson*, 2015 IL App (3d) 140300, ¶ 47. The record suggests that C.W. was much more capable of expressing herself than K.R.L. We have already noted the evidence indicating that she understood the duty to tell the truth.

¶ 84    Defendant argues that the inconsistencies in C.W.'s account at trial were so serious that the court should have concluded that C.W. was not competent to testify. His discussion focuses on C.W.'s inability to recall what occurred in 2016 and earlier, particularly in her interviews with Mueller. Defendant overstates the flaws in C.W.'s testimony. C.W. testified that defendant touched her privates, and made her touch his privates, when they were in the bathroom in defendant's trailer. Her account was consistent with what she told Mueller at the first interview.

However, to the extent that C.W. did struggle to remember things that happened when she was five, that is not a mark of lack of competency under section 115-14(b), which requires only an understanding of the necessity to tell the truth and ability to express oneself.

¶ 85                      2. The Admissibility of C.W.'s Out-of-Court
                             Statements under Section 115-10

¶ 86    Under section 115-10(a), in a prosecution for a physical or sexual act perpetrated upon or against a child under the age of 13 (725 ILCS 5/115-10(a) (West 2018)), the court may admit testimony of the child's prior complaint of such act if "[t]he court finds in a hearing *** that the time, content, and circumstances of the statement provide sufficient safeguards of reliability," (725 ILCS 5/115-10(b)(1) (West 2018)) and either the victim testifies or the victim is unavailable and corroborative evidence of the relevant act exists (725 ILCS 5/115-10(b)(2) (West 2018)). "The probative value of corroborating complaints in these cases, especially in videotaped form, has been widely recognized." *People v. Bowen*, 183 Ill. 2d 103, 115 (1998). "Children may be subject to memory loss in the often prolonged period between the abuse and trial, and videotaping the child's account of abuse at the earliest opportunity preserves the account while it is still fresh in the child's memory." *Bowen*, 183 Ill. 2d at 115-16.

> "In determining the reliability of the child's hearsay statement, relevant factors include, but are not limited to, (1) the spontaneity and consistent repetition of the statement; (2) the mental state of the child in giving the statement; (3) the use of terminology not expected in a child of comparable age; and (4) the lack of a motive to fabricate." *Bowen*, 183 Ill. 2d at 120.

For instance, one such additional factor is the extent of the delay between the alleged incident and the statement sought to be admitted. *Bowen*, 183 Ill. 2d at 120. " 'The State, as the proponent of the challenged statements, [bears] the burden of establishing that the statements were reliable

and not the result of adult prompting or manipulation.' " *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 96 (quoting *People v. Zwart*, 151 Ill. 2d 37, 45 (1992)). "When conducting a reliability determination, a trial court evaluates the totality of the circumstances surrounding the making of hearsay statements." *People v. West*, 158 Ill. 2d 155, 164 (1994). We review for abuse of discretion the trial court's admission of statements under section 115-10. *People v. Williams*, 193 Ill. 2d 306, 343 (2000).

¶ 87    As we noted, defendant has conflated the issue of C.W.'s competency with the issue of the admissibility of her out-of-court statements under section 115-10. Thus, when defendant argues that the court erred in admitting those statements, he asks us to address the issue using the competency standards. He contends that the differences between C.W.'s statements in the July 6 and July 25, 2016, interviews show that she "lack[ed] the ability to receive correct impression[s] from her senses," and did not appreciate the moral duty to tell the truth. This argument coincidentally touches on at least part of the first factor in a section 115-10 analysis, namely "the spontaneity and *consistent repetition*" of the child's out-of-court statement (emphasis added) (*Bowen*, 183 Ill. 2d at 120).

¶ 88    Following the initial disclosure to Lupe, C.W. consistently said that, on the last day she was with defendant, he touched her genital area and then forced her to touch his genital area. That consistency remained despite variations in her account of the details surrounding the incident.

¶ 89    Defendant makes no argument pertaining to the remaining section 115-10 factors. We conclude that the trial court did not abuse its discretion in admitting C.W.'s out-of-court statements under section 115-10.

¶ 90                    B. The Exclusion of Campion's Testimony

¶ 91    Defendant asserts that the trial court erred in refusing to allow Campion to testify as an expert witness.

¶ 92    In Illinois, a court will usually allow a person to testify as an expert if that person has knowledge otherwise unavailable to the jury and that the testimony will aid the jury in its decision:

> "[Under the supreme court's established precedent] expert testimony is only necessary when the subject is both particularly within the witness's experience and qualifications and beyond that of the average juror's, and when it will aid the jury in reaching its conclusion. [Citations.]   Expert testimony is not admissible on matters of common knowledge unless the subject is difficult to understand and explain.   [Citation.]   A trial court does not err in barring expert testimony where the matter at issue is not beyond the ken of the average juror."   *People v. Becker*, 239 Ill. 2d 215, 235 (2010).

¶ 93    We review for abuse of discretion a trial court's decision whether an expert witness is qualified to testify in a particular subject area and whether the proffered testimony is relevant. *People v. Nelson*, 235 Ill. 2d 386, 430-31 (2009).

¶ 94    Defendant contends that Campion, as a licensed clinical psychologist, was qualified to give an expert opinion.   That contention is likely correct.   However, defendant fails to address how Campion was qualified in the *specific areas upon which he proposed to opine* and how the proposed opinions would have aided the jury in reaching its conclusion.   We conclude that Campion lacked the expertise necessary to opine on C.W.'s behavior and that his opinion concerning defendant's psychological state was too vague to aid the jury in reaching its conclusions.

¶ 95    First, nothing in Campion's *curriculum vitae* or his testimony suggested that he had any qualification to testify about behaviors of very young victims of sexual abuse: he was unable to

recall any experience at all with such children. Indeed, in his brief, defendant argues that Campion's expertise is in evaluating first responders. In any event, Campion's testimony did not make clear how his opinion that C.W. exhibited attention-seeking behavior addressed a matter beyond the ken of average jurors. The features Campion noted in C.W.'s behavior—her distractibility and her enjoyment of speaking to the interviewer—would have been apparent to the jury from the recordings. It is not clear what Campion's opinion would have contributed other than giving a veneer of authority to observations that individual jurors could make for themselves.

¶ 96    The court also did not err in excluding Campion's opinion that defendant "did not indicate significant emotional concerns," and that the evaluation results did not show "a potential risk for maladaptive behavior." Because this opinion is vague, it would not have aided the jury in reaching its conclusion. Campion failed to use whatever expertise he had to explain the results' meaning. Moreover, Campion's testimony did not show that his expertise was relevant to evaluating an accused person who is highly motivated to game any testing system. When asked by the State about this difference, Campion did not attempt to explain how experience in the one area would carry over into the second. He merely said his testing included questions about criminal behaviors, an answer which suggested that he failed to grasp the State's concern.

¶ 97                    C. Exclusion of Frisbie's Testimony

¶ 98    Defendant asserts that the court erred in excluding Frisbie's testimony about overhearing someone, whom he contends was Corrine, talking about the charges against him as a means of getting money from his family. However, defendant has not set out a coherent argument for that proposition, and he has thus forfeited the claim. As we noted, Rule 341(h)(7) requires an appellant's brief to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" (Ill. S.

Ct. R. 341(h)(7) (eff. May 25, 2018). Points not supported by adequate argument are forfeited. See, *e.g.*, *Patel*, 366 Ill. App. 3d at 274. Here, defendant argues only that the evidence was adequate to show that the person whom Frisbie overheard was Corrine. He does not explain why this made the testimony admissible and does not cite any authority to support his claim.

¶ 99                                         D. Questioning of Michelle

¶ 100   Defendant asserts that the trial court erred in declining to grant a mistrial after it sustained the defense's objection to the State's question to Michelle whether she kept records to protect herself because she was married to defendant. However, as the State points out, he has not adequately developed this argument. He merely asserts without supporting discussion (1) that the State "had no reasonable expectation of having evidence to support that question," (2) that the question "suggested guilt of the Defendant," and (3) that the question was of the type condemned in *Meeker*. As just noted, points not supported by adequate argument are forfeited.

¶ 101   In any event, forfeiture aside, defendant's reliance on *Meeker* is misplaced. In *Meeker*, the issue was whether the defendant, who was charged with tax offenses, had been deprived of a fair trial by the prosecution asking the witnesses four questions that "invited the jury to convict [the defendant] on facts outside the record, some of which were patently untrue, and others of which were not admissible at trial." *Meeker*, 558 F.2d at 390. For instance, the prosecution asked the defendant's accountant, " 'Do you recall [the defendant] commenting to you that he always is going to owe additional tax because he takes questionable deductions and things like this?' " *Meeker*, 558 F.2d at 388. According to the *Meeker* court, the "manifest implication of the question [was] that [the defendant] told his bookkeeper that he underpaid his taxes by taking questionable deductions." *Meeker*, 558 F.2d at 388. This implication of wrongdoing, the court noted, "was not supported by evidence the prosecutor was prepared to present." *Meeker*, 558 F.2d

at 388.   The court remarked that "[i]t is axiomatic that an attorney, and a prosecutor in particular, should not allude to matters that he has no reasonable basis to believe are relevant to the case or that will not be supported by admissible evidence."   *Meeker*, 558 F.2d at 388.

¶ 102   The second of the four questions likewise implied past wrongdoing by the defendant and was "highly prejudicial *** because the jury might infer from the implication of past illegal behavior that the defendant [was] more likely to have committed the crime for which he is presently standing trial."   *Meeker*, 558 F.2d at 388.   In their totality, the four questions were "so prejudicial to the defendant that [the court could not] deem them harmless."   *Meeker*, 558 F.2d at 390.

¶ 103   This case is unlike *Meeker*.   We note the context of the question that defendant claims was improper.   The State asked Michelle why she took pictures of C.W. sleeping in a bed at the Jacobses' home.   Michelle replied that she always documented C.W.'s and Connors longer stays with her and defendant.   As the State was asking a further question, Michelle interjected that she documented the stays in order to protect herself.   The State then asked a question that likely occurred to the jury, *i.e.*, whether Michelle wished to protect herself because she was married to defendant.   Unlike in *Meeker*, the State was not implying any wrongdoing by defendant other than the conduct charged.   Even if this question was somehow improper, it was a single question as opposed to the multiple questions in *Meeker*, the cumulative effect of which led the reviewing court to order a new trial.   Therefore, even if defendant had argued this issue properly, we would not have deemed it a basis for reversal.

¶ 104                                    E. Closing Argument

¶ 105   Defendant asserts that his trial was unfair because the State made a series of improper remarks in closing arguments, rising to the level of prosecutorial misconduct.   Specifically, he

contends that the prosecutor (1) repeatedly made statements of opinion, (2) improperly told the jury that she was thankful for people like Mueller, (3) improperly "disparaged defense counsel [by telling] the jury that he was 'thinking about zebras,' " and (4) repeatedly "told the jury how kids act." Defendant asks that we review these claims as "plain error." He thus implicitly concedes that he did not preserve the matters for review. The State agrees with the implication, noting that defendant did not object when the prosecutor made these comments. Defendant, however, does not explain why we should review his arguments for "plain error." Thus, to the extent that we may consider the claims only as plain error, defendant has forfeited such review. *Patel*, 366 Ill. App. 3d at 274 (the defendant forfeited plain error review when he failed to explain how either prong of the plain-error standard was applicable).

¶ 106    As we noted, in criminal cases, "to preserve an issue for review, a defendant must raise it in *either* a motion *in limine* or an objection at trial, *and* in a posttrial motion." (Emphases in original.) *Denson*, 2014 IL 116231, ¶ 18. Defense counsel made only one objection during closing argument. When the prosecutor started to speak about what she "believed" C.W. had testified, defense counsel interjected, objecting that it was "improper for [the prosecutor] to talk about what she believes or what she feels." The court overruled the objection but admonished the jury that closing arguments are not evidence. The prosecutor's comment had no potential for prejudice because counsel objected before the prosecutor could mention what she believed C.W. testified. This claim—the only claim of alleged prosecutorial misconduct that defendant has preserved for appeal—is not a basis for reversal.

¶ 107                              F. Sufficiency of the Evidence

¶ 108    Defendant challenges the sufficiency of the evidence to support a conviction. We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979),

as adopted by *People v. Collins*, 106 Ill. 2d 237, 261 (1985): when a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). "[W]here the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt," but, "[i]n conducting this inquiry, the reviewing court must not retry the defendant." *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). "Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. Although we must accord great deference to the fact finder's decision to accept testimony and must view the evidence in the light most favorable to the prosecution, the fact finder's decision is not conclusive. *Cunningham*, 212 Ill. 2d at 280. The properly admitted statements of a single witness, if positive and credible, are sufficient to support a conviction, even though the defendant contradicts those statements. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, (2009). However, the statements of such a witness may be impeached to such a degree that the evidence cannot establish a defendant's guilt beyond a reasonable doubt. *People v. Schott*, 145 Ill. 2d 188, 209 (1991).

¶ 109 The jury found defendant guilty on counts II and III (aggravated criminal sexual abuse) but not guilty on count I (predatory criminal sexual assault). Thus, the jury found that defendant touched C.W.'s vagina with his hand and also placed his penis in C.W.'s hand, but did not find that defendant inserted his finger in C.W.'s vagina. Although C.W. alluded to abuse that occurred

in Shannon (Carroll County), defendant was charged only with abuse that took place in Forreston (Ogle County).

¶ 110 We would be justified in finding that defendant has forfeited his argument on the sufficiency of the evidence. First, he asserts throughout his argument that the jury verdicts were "against the manifest weight of the evidence." This is the standard of review for verdicts in civil cases, not criminal cases. See *Dayton v. Pledge*, 2019 IL App (3d) 170698, ¶ 52. Second, defendant's two-paragraph argument is devoid of citations to the record, in violation of our supreme court rules. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (argument must be supported by citations to the record). Nevertheless, we will pass briefly on the points defendant raises.

¶ 111 Defendant complains that the State's case "was bolstered by *** hearsay statements which the State elicited from various witnesses but [which] were *** inconsistent." Defendant goes on:

"A good example is [Lupe] alleging that the minor child said that [defendant] 'touched her.' The clear implication is that this was an improper touching of a sexual nature. As it turns out, the touching involved tickling and [C.W.] 'didn't like it.' There can be no reason to allow that testimony except to give the false impression that the Defendant is engaged in some pattern of misconduct or to mislead the jury in terms of thinking about this happening on multiple occasions."

¶ 112 Defendant complains that the trial court "allow[ed]" testimony such as Lupe's, but he does not develop an argument, in this section of his brief or elsewhere, for why its admission was improper. As for the *weight* of that evidence, defendant suggests that Lupe's testimony was misleading because it was clear that when C.W. reported to Lupe on July 1, 2016, that defendant "touched her," C.W. meant only that defendant tickled her. Corrine did testify that, on May 30, 2016, C.W. reported that defendant touched her and then clarified that it was just tickling.

However, Lupe testified that, when C.W. reported on July 1 that defendant touched her, she pointed to her crotch, where, upon inspection, Lupe noticed redness and irritation. Thus, the jury had reasonable grounds to believe that C.W. was reporting to Lupe a sexual touching.

¶ 113 Defendant also attacks C.W.'s testimony as "unreliable and so inconsistent that it should not have been admitted." He continues:

"In light of the unequivocal statement of [C.W.] that it happened only once, the testimony later on that it happened over and over even at places where the Defendant had never been, makes the evidence so inconsistent as to not support a verdict of guilt in this case. In the absence of any reliable evidence by a witness who is consist[ent] and who can demonstrate an understanding of the difference between truth and fantasy[,] this verdict is against the manifest weigh of the evidence."

¶ 114 We recognize that C.W.'s statements at the first and second interviews were inconsistent. In her first interview C.W. insisted that only one incident of improper touching had occurred. At the second interview, she described an indefinite number of other incidents. However, the first interview focused on the assault that C.W. said had occurred at the end of June 2016, whereas the second interview focused on assaults that occurred significantly earlier and likely would have been difficult for a five-year-old to recall. Thus, the jury could have reasonably found that C.W. gave positive and credible prior statements about the later assaults, despite any deficiencies in her statements about the earlier assaults.

¶ 115 The jury also could have reasonably found that C.W.'s trial testimony was positive and credible. She straightforwardly testified that defendant took her into the bathroom of the trailer, touched her private area, and then made her touch his private area. C.W. had difficulty remembering precise details of the assault, but not to an extent that is surprising for a seven-year-

old who was recalling events that were two years in the past. Her testimony was consistent with her prior statements describing the assault. In particular, even as C.W. was uncertain about exactly what happened before and after the assault, she consistently described defendant touching her genital area with his hand and forcing her to touch his penis.

¶ 116 Defendant insinuates in his argument on appeal that C.W. did not understand the difference "between truth and fantasy." He does not elaborate. C.W.'s statements to Mueller did include implausible and possibly fantastic elements. However, it is not our function to marshal those instances into an argument on defendant's behalf. See, *e.g.*, *People v. Universal Public Transport, Inc.*, 2012 IL App (1st) 073303-B, ¶ 50 (holding that a reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented and that it is neither the function nor the obligation of this court to act as an advocate or search the record for error).

¶ 117                                III. CONCLUSION

¶ 118   For the reasons stated, we affirm the judgment of the circuit court of Ogle County.

¶ 119   Affirmed.